Our final case for this morning is United States v. Tepiew. Mr. Phillip, it's your turn. Good morning. May it please the Court, my name is Tom Phillip. I represent the defendant, Appelant Loni Tepiew. I'd first like to thank the Court for accommodating my schedule and changing the oral argument to today's date from a date that I was unavailable. There's no dispute in this case that law enforcement entered Ms. Tepiew's trailer home by kicking in the door. The dispute is whether that entry was objectively reasonable under the emergency aid exception to the Fourth Amendment's warrant requirement. And my argument is that that entry was not objectively reasonable. Here's what worries me about your position, and I'm worried about the government's position, too, so this is equal opportunity worrying. But what concerns me about your position is that there is some evidence that the officers have that the child, whether he's 19 months old or 12 months old or whatever is not material to me, has a puffy head, which is some reason to believe that there's a head injury. And head injuries do happen to abused small children, and they can rapidly turn life-threatening. So I'm not as worried about the bruises on mom in terms of the urgency of this. I understand your point that they could have phoned in for a warrant, or maybe they could have just taken the two hours to have driven back and gotten one. But there's some reason to believe maybe something pretty urgent is going on with the child. Well, Your Honor, a 19-month-old, 12-month-old, whatever it is, can also have a bad cold. I understand that, but should the police roll the dice that way? Well, I don't think that they need to roll the dice. I think that they need to actually talk to the 7-year-old, which they didn't do. The officer, when he arrives at the primary school, simply talks to the school counselor. The school counselor talked to the child earlier, and so the officer just reviews the drawing and the handwritten school paper assignment, I guess it was, from the 7-year-old, and then he reviews an e-mail that was sent between two of the school staff members. And he did speak with the staff? He spoke with one staff member, as best as I can tell. It would be Counselor Wilkie. And that was the counselor who interviewed her? I believe that counselor spoke to the child. Or interviewed Lonnie? Yes, or interviewed the child, T.T. Right, yeah, but that was the direct, that was T.T. who? Right, the officer never spoke to the 7-year-old directly at all. Right, I understand. But when you were outlining everything, I didn't hear that part of it. I didn't hear you say that he had actually spoken with that counselor. Yes, he did speak to Counselor Wilkie. And that matters, because he's the one who actually interviewed the child. Right, but the officer doesn't then follow up with doing anything else. Everything the officer gets is secondhand. Is it so crazy, though, for the officer to think that the 7-year-old child is going to be more forthcoming with a familiar person, such as the school counselor, and that she might not really have anything else to offer? I mean, 7 is pretty young. Well, there's a couple of different ways to approach that, I suppose. The officer could go with the counselor to speak with the 7-year-old. The officer could say to the counselor, can you find out the answers to these questions for me? These are things that I'm curious about. What did the child see regarding her brother? And when did that happen regarding her brother? And I think talking to the 7-year-old directly as well gives the officer an idea of the child's credibility. If this is something that the child has fabulized and made up, if this child is going to be very specific and direct, that I saw my mom's boyfriend do A, B, or C. But the subset of this that I'm focusing on, this is the part that worries me, because I think you've got a very strong case on some other parts of it, but her brother's face looked puffy that morning. That's an unusual word to use about a face, and it seems potentially quite troublesome. It doesn't matter who made it puffy, whether it was the mother, the boyfriend, a next-door neighbor. That's not in her original note. Her original note just talks about her mother getting kicked in the ribs with a black eye. Right. The puffy face portion comes from the e-mail exchange between two other staff members that was shown to the officer. So that might even be one more step removed from Counselor Wilkie talking to the child directly. But to try to answer the court's question, we're trying to parse the word puffy, I don't know what that means. It could mean any number of things. Some may be being alarming, some may be being de minimis. And what do we do with that fact? I mean, we're talking about a very young child, under the age of two, and even though a puffy face might be that you just have a bad head cold or something, although I'm not sure that's the adjective, but let's just say. But it might mean a fractured skull, which, of course, is what it does turn out to mean. Did the officers just take no action? Don't regard it as an emergency? I don't think that they should take no action. I think that they should take more action than what they did do because they just took that puffy and went to the scene. They didn't do anything to actually, again, talk to the 7-year-old. Yeah, but then when they get to the scene, they hear, they see the curtain move out the corner, and they hear this fast-paced walking and the front door and the back being locked, and then they call the prosecutor, and the prosecutor says it's okay. They didn't need a warrant. So that reliance on the prosecutor, I think, takes them off the hook. Well, I think, Your Honor, that the information given to the prosecutor was factually incorrect, and so the prosecutor's advice is faulty because it's based on an incorrect premise. But this is a motion to suppress that we're dealing with, obviously reserved here. And we have concepts of good faith in the question whether the police, even if they should have gotten a warrant, they made a mistake, but did they think that their actions were justifiable anyway. They've checked with a lot of people. They have some evidence to suggest something very troublesome may be going on. And as I say, I think your point that they could have gotten a warrant is a serious point, but they do a lot of stuff. They go straight to the house because they're worried about what's going on, and they call the prosecutor. Then I realize they don't do too much. They kind of knock on the door a few times, and then they kick it down, which is obviously very, very intrusive. Well, when they get there, because what we're talking about, I have to go back to the beginning, what we're talking about is whether there's an emergency. And I would argue that there's not an emergency described at the school, there's not an emergency on the way to the residence, and there's not an emergency when they arrive at the residence. When they arrive, they don't find anything. Cases suggest where there's an exigent need to get into a home, that there's something going on. They certainly don't hear sounds of combat or anything like that. An emergency could be that somebody's lying on the floor, too impaired to do anything as well, like the little boy. But they don't know that the boy is even in the home at the time that they arrive. That's true. On the other hand, it's the middle of the week. He's a very young child. I suppose they could be shopping. And the fact that the 7-year-old gets to school that day I think is a point that cuts against there being an emergency as well. Someone got that child to school, the 7-year-old, presumably can't get there on their own. The primary school is located, as the officer testified, about 15 minutes away from the trailer home where the events occurred. Is there a school bus, or did parents get them there? I don't know the answer to that question, Your Honor. Unless the Court has other questions. No, you can save your last minute. That was fine. Thank you. Yes, Mr. Humble. May it please the Court, my name is Daniel Humble, and I represent the United States here today. So my problem on your side is really, in some sense, the deliberateness with which the officers do take these steps. They have very little information about what's going on that would indicate an emergency, and nothing, particularly with the possibility of phone warrants, but nothing that gives rise to any belief that you'd actually bash in somebody's front door, you're in the home, without a warrant. And I don't know if the word puffy is quite enough to get you there, to excuse the warrant. Well, first of all, I think Your Honor used the term deliberate, and I think that's true. I think these officers were measured and reasonable and deliberate. So all the more reason to get a warrant. Would this have been probable cause? I suspect a judge would have issued a warrant on the basis of this much. First, let me get to the puffiness, and then I'll go to the search warrant issue. I think Your Honor was absolutely correct when you say puffiness on a 1-year-old, 19-month-old, is in and of itself a concern. No matter what the situation, you take that child to a doctor, or you seek some type of medical attention for puffiness to an infant. I think it's also remarkable that a 7-year-old, just using common sense, what we know about 7-year-olds, would even find remarkable the fact that her brother had a puffy head. The sterile record uses the term puffy, but put it in the context of a 7-year-old, a 7-year-old uses the terms that they could use. And I think a brother's head was puffy. When we're using that in the context of also describing injuries to her mother, give a pretty clear picture to the officers that there's something amiss. The word in the email is face. Her brother's face was puffy. Again, what 7-year-old walks out the door to go to school and notices what's going on with their infant brother? I think it's the rare 7-year-old who does that. But again, the officers receive this information. They are deliberate. They are reasonable. They get the CPS worker, the child protection worker. They don't, as is mentioned in the brief, and I think it inures to their benefit, they do not throw on the lights and sirens, tear off across the reservation, going to go kick in the door. Why? Because they don't know what they're coming up on. But they learn nothing else. So they see, you know, a curtain. They hear some doors being locked. That could be people who just don't want the police coming into their house. It certainly could. But that doesn't mean that they can't take what they're seeing and hearing at that residence and make their own inferences. But it's not like any of the other cases I can think of, sort of no preexisting reason to think there's an emergency, which is the 9-1-1 case. People don't call 9-1-1 without some urgency, unless it's an abusive call, which it was not in the case at hand. There's just nothing. Well, I think this Court inventors cited to the Black case in the Ninth Circuit, and I think that's also a situation where they were unaware of whether the victim was even in the apartment, and they made the decision to go in there. And in that instance, the Ninth Circuit, which this Court adopted the reasoning essentially, said, we expect these officers to be conscientious. We don't expect them to hold trials outside the door, trying to weigh all of the evidence, whether it's beyond a reasonable doubt. We want them to do what's right and what's reasonable, and that's what these officers did. But the real question is, you know, certainly driving to the house, fine, not roaring through the reservation with the lights flaring is probably a good thing, since it saves, you know, reduces the safety risk for others. But then they get there, and they just have these snippets of information. So why not, rather than kick the door in, you know, why not get a warrant? Well, I think you have to put it in the context of what is alleged. Domestic abuse situation, because as the child reported, the boyfriend was beating up, hurts my brother, and we know that there's injuries to the mother. So unlike as you spoke of, there's no combat, there's no gunshots, there's no glass breaking. Put it in the context. What are we actually talking about? We're talking about a false imprisonment type situation, somebody who's being prevented from getting medical attention. You wouldn't expect to hear loud argument inside if they know the police are outside. What you would expect to hear is the furtive movements inside, locking the doors, looking out the curtain to see who was actually there. If I could go to the search warrant issue. And then no response to the announcement that they were there, right? I'm sorry, Your Honor? No response to the announcement that they were there. Both announcements. Two times. Right, two times, no response. Correct. And then when the child is describing what's going on with the mother, she doesn't say she was hurt yesterday or anything. She says she is hurting, and I helped her because I helped her to the bed. I mean, that had some bearing on it. And the email says this morning. So whereas the domestic violence may have been over the weekend, it's very clear in that email, it's related to the police, that morning the child saw the puppy head. With regard to the search warrant, I do want to clear something up. Counsel cites in his brief to the fact that Wisconsin state statute allows for telephonic application of search warrants as well as the federal rule, but he does not cite to the Menominee Tribal Code, which is the real question here. So this is Indian country? This is Indian country. And I'll be the first to say I was remiss for not putting this in my brief, but the tribal jurisdiction, the code, which would be Tribal Legislature Ordinance 79-14, Section 11.16, does not allow for telephonic applications for a search warrant on the Menominee Indian Reservation. Would you go to a closer place to get a tribal official to issue a warrant? It specifically says you have to go to a tribal judge, and the testimony was very clear from the officer that that would take at least an hour and a half, if not two hours. And he uses this term. So that's what the officer is talking about, though, finding a tribal judge. Yes. And he says at, and I'm quoting, he says, at a minimum we're talking an hour and a half to two hours. Is that reasonable? Was that 79-14, 11.16? I just wanted to make sure. It's Menominee Tribal Legislature Ordinance number 79-14, and then it appears to be a subsection of Section 11.16. Okay. And I'd be happy to supply that to you. I take it that you're conceding that the exclusionary rule applies to errors by tribal officers. Is that established anywhere? I do not know the answer to that, Your Honor. Tribal sovereignty predated the Fourth Amendment. I believe that it is applicable to the tribal officers, but I can't say for certain. Wisconsin is a public law, whatever it is, 280 state, right? So that has something to do with the degree. I think it does have something to do with the degree of tribal authority and the applicability of general standards. And I see I'm getting close here on my time. If I could also just say to the court that should this court determine that officers do not act objectively reasonable and do not uphold the district court's ruling, I would ask, as I state in footnote three and page nine of the brief, that this be remanded to the district court, which never reached the question that I had presented of attenuation or inevitable discovery. I believe that's proper. But as far as the exclusionary rule goes, Your Honor, going to that, we do that to punish law enforcement, essentially, to say, hey, you acted improperly. What conduct of law enforcement here are we attempting to punish? They did, along with Hanson and the black kids, they did what we expect them to do. They were conscientious. They were, again, methodical. They didn't just make an assumption and boom, go. They went and got the CPS worker. They called the prosecutor. They called a supervisor. They waited. They observed. And their observations led them to one reasonable, objectively reasonable conclusion, that there was an injured child inside and probably an injured mother. And, of course, when they do get inside, it turns out that is the case. So unless Your Honor does have any other questions, I will go ahead and sit down. Thank you. Apparently not. Thank you very much. And I think you saved about a minute, Mr. Phillip. And that's all I'll use. The government said that the officer's activity was measured. Measured is not an emergency. We are talking about the emergency aid exception, and measured activity is not emergent activity. It doesn't respond. But, of course, the nature of your argument is that they should have taken more time, interviewed more people, and done more thinking. So I take it your argument is as soon as they do that, then they are, of course, precluded from making an emergency entry. Because you say they didn't take enough time before making an emergency entry. They had time to do things other than what they did. They could, from the start of when they got the call, they could have gone to the tribal court to start getting the warrant rather than going to the residence and kicking in the door. The purpose of the exclusionary rule is to deter the officers, not necessarily to punish, but to deter them. And here we would be deterring them from kicking down the door of a home, exactly the kind of thing that the Fourth Amendment is designed to prevent. Thank you. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement, and the court will be in recess. Thank you.